IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ATLANTIC TRADING USA, LLC,<br>on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORP., BANK OF<br>AMERICA LLC, CITIBANK N.A., CITIGROUP<br>GLOBAL MARKETS INC., J.P. MORGAN<br>CHASE & CO., J.P. MORGAN CLEARING<br>CORP., J.P. MORGAN FUTURES, INC.,<br>UBS AG, UBS SECURITIES LLC, CREDIT<br>SUISSE GROUP AG, CREDIT SUISSE<br>SECURITIES (USA) LLC, HSBC HOLDINGS<br>PLC, HSBC SECURITIES (USA) INC.,<br>BARCLAYS BANK PLC, BARCLAYS CAPITAL<br>INC., LLOYDS BANKING GROUP PLC, THE<br>NORINCHUKIN BANK,  WEST LB AG,<br>ROYAL BANK OF SCOTLAND GROUP PLC,<br>RBS SECURITIES INC., DEUTSCHE BANK AG<br>AND DEUTSCHE BANK SECURITIES INC.,| )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. |

## CLASS ACTION COMPLAINT

Plaintiff Atlantic Trading USA, LLC ("Plaintiff"), by its undersigned counsel, brings this action against Defendants Bank of America Corp., Bank of America LLC, Citibank N.A., Citigroup Global Markets Inc., J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Futures, Inc., UBS AG, UBS Securities LLC, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, HSBC Holdings plc, HSBC Securities (USA) Inc., Barclays Bank plc, Barclays Capital Inc., Lloyds Banking Group plc, The Norinchukin Bank,  West LB AG, Royal Bank of Scotland Group plc, RBS Securities Inc., Deutsche Bank AG and Deutsche Bank Securities Inc., (collectively, "Defendants"), pursuant to the Commodity Exchange Act, 7 U.S.C.

§ 1, *et seq.* (the "CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and the common law, on behalf of itself and all others who, between January 1, 2006 and December 31, 2009 (the "Class Period"), purchased, owned or traded Chicago Mercantile Exchange, Inc. ("CME") Libor-based contracts or financial instruments. Plaintiff's allegations are based upon personal knowledge with respect to Atlantic Trading USA, LLC's conduct and upon information and belief as to other allegations based on facts obtained through its attorneys' investigation.

## INTRODUCTION

1.     The Panel Defendants (*see* ¶ 43 *infra*) manipulated and suppressed the US dollar London Interbank Offered Rate ("Libor") during the Class Period.  Libor is a reference interest rate calculated daily by the British Bankers' Association ("BBA").  Libor is used in the pricing of a variety of financial products traded by Plaintiff, the Class and the Panel Defendants.

2.     The Panel Defendants and other major banks self-report to the BBA the rate at which they could "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in a reasonable market just prior to 11 am [GMT]."  The BBA uses the self-reported rates to calculate Libor in various maturities and across multiple currencies. This case concerns only the United States dollar-based Libor ("USD Libor").  Because Libor is based directly on self-reported information, rather than by reference to activity in an efficient marketplace, Libor rates are susceptible to manipulation by the Panel Defendants.  False reports are a traditional form of manipulation in commodities markets.

3.     The Panel Defendants are major financial institutions with substantial economic exposure to interest rates, including Libor.  The Panel Defendants, therefore, both affect the rate at which Libor is set and reap substantial profits—or suffer large losses—depending on where

Libor is set, how it changes and the extent to which they trade in CME contracts based on Libor rates.

4.    The Panel Defendants' manipulation of Libor is apparent from the manner in which USD Libor deviated from longstanding relationships with market-priced interest rates and financial instruments.  Unlike Libor, market-priced instruments are tied to trading activity in efficient markets and are less susceptible to manipulation.  Prior to the Class Period, USD Libor exhibited predictable and consistent correlations with market-priced instruments such as Eurodollar deposits ("Eurodollar Bid Rate") and credit default swaps ("CDS").  During the class period, USD Libor broke from these historical trends, demonstrating the extent to which the Panel Defendants were manipulating Libor.

5.    The Panel Defendants' self-reported rates further reveal their manipulation of USD Libor.  As described in detail below, the BBA collects rate quotes from 16 banks to calculate USD Libor.  In order to prevent outliers from impacting Libor, the BBA excludes the four highest and the four lowest reported rates and calculates the arithmetic mean of the remaining eight rates.  Quoting extremely low rates would not impact Libor because the rate would be ignored.  Rather, a bank seeking to manipulate Libor must report rates at or just above the fourth-lowest rate reported that day.  During the Class Period the Panel Defendants consistently "bunched" their reported rates at or just above the fourth-lowest rate quote.  Absent manipulation, Defendants' self-reported rates should have been evenly distributed.

6.    In addition, certain Panel Defendants self-reported USD Libor rates that were far lower than competitor banks, yet were higher (when compared to those same competitor banks) for other currency-specific Libor rates.  Although interest rates may vary across currencies, the positioning of banks across currencies should remain constant since the factors that impact a

bank's inter-bank borrowing rate are the same regardless of currency.  Empirical studies indicate that several such discontinuities persisted during the class period.

7.     Strategists employed by various Defendants estimated that USD Libor was substantially depressed during the Class Period.  Citibank's Scott Peng concluded that Libor was suppressed by 30 basis points ("bps").  Credit Suisse's William Porter estimated an even greater suppression of 40 bps.  Barclays Capital's Timothy Bond, when describing the repercussions when Barclays decided for a limited time "to quote the right rates," admitted that "[t]he rates the banks were posting to the BBA became a little bit divorced from reality."  Other analysts agreed with their assessments.  An October 28, 2008 "Client Alert" from the law firm Milbank, Tweed, Hadley & McCoy LLP noted that "[l]enders in the bank loan market have expressed increasing frustration over the apparent fact that the publicly quoted LIBOR is lower than the actual rates they pay for Eurodollar deposits."

8.     The Panel Defendants manipulated Libor for a number of reasons, but one stands out: to improve their bottom line by maximizing revenues from Libor-based financial products. The Panel Defendants purchase and trade a variety of swaps, loans, interest rate derivatives and other financial instruments whose values are tied directly to Libor, including Libor-based CME products.  During the class period, the Panel Defendants' overall position in these instruments was such that they stood to gain financially as USD Libor decreased.  Rather than accurately report interest rates to the BBA and adjust their positions accordingly, the Panel Defendants opted to falsely report lower rates in order to manipulate USD Libor downward.  Although the Panel Defendants originate loans whose interest rates are derived from Libor, Defendants used "rate floors" to prop up loan rates while they suppressed Libor, thus maximizing interest income.

9. The Panel Defendants also manipulated Libor in order to maintain the appearance of financial security. After the financial crash of 2007 claimed many formerly successful financial institutions, the Panel Defendants' access to funds became more constrained. By manipulating Libor downward, the Panel Defendants were able to convey the impression that they had easy access to the cash necessary to avoid bank runs when they actually did not. Thus, the Panel Defendants submitted fraudulent quotes to manage public perceptions of their credit risk and thereby maintain some semblance of liquidity.

10. The Panel Defendants knew or, at minimum, grossly and recklessly disregarded the fact that their artificial USD Libor reporting would cause artificiality in and manipulation of CME products tied to USD Libor, including the CME's 3-month Eurodollar futures and options contracts.

11. The Panel Defendants' unlawful conduct caused and forced CME Clearing (*see* ¶ 42 *infra*) to settle CME Eurodollar and many other standardized futures contracts at the manipulated Libor prices caused by the Panel Defendants.

12. This activity occurred in violation of CME Rule 432 and similar CBOT rules prohibiting price manipulation. Consequently, this activity also breached the standardized CME Eurodollar futures contract and other standardized CME and CBOT futures contracts, which expressly provided that their performance was subject to and contractually required to comply with the CME or CBOT Rules.

13. The Clearing Defendants (*see* ¶ 44 *infra*), who are subsidiaries or affiliates of the Panel Defendants and were members of CME Clearing during the Class Period, knowingly aided and abetted the manipulation.

14.     Defendants' unlawful and intentional misreporting, suppression, and manipulation of Libor rates, as well as their efforts to restrain trade in the market for Libor-based derivatives, during the Class Period, were in violation of Sections 4s(h), 9(a)(2) and 22(a) of the CEA, 7 U.S.C. §§ 13(a)(2) and 25(a), and the Sherman Act, 15 U.S.C. § 1.

## JURISDICTION AND VENUE

15.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, Section 22 of the CEA, 7 U.S.C. § 25, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

16.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26(a), and 28 U.S.C. §§ 1331, 1337.

17.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d).  Each of the defendants transacted business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.  Defendants' unlawful conduct manipulated the prices of CME and CBOT Libor-based futures and options contracts traded in this District.

## PARTIES

18.     Plaintiff Atlantic Trading USA, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  During the period January 1, 2007 through and including December 31, 2009, Atlantic Trading USA, LLC purchased and sold CME 3-month Eurodollar futures and options contracts.

19.     Each Panel Defendant is active in the market for CME Eurodollar futures contracts and was cognizant of the effects that their manipulation of Libor was having on the

Eurodollar futures contract market, as well as the markets for other standardized contracts priced on the basis of USD Libor. With such knowledge, each Panel Defendant intentionally caused USD Libor to lower and thereby manipulated to artificial levels CME Eurodollar futures contracts and other standardized contracts priced on the basis of USD Libor.

20.     Defendant Bank of America is a corporation organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina. At all times relevant hereto, Bank of America served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

21.     Defendant Bank of America Securities LLC ("Bank of America Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Bank of America and was engaged in clearing CME futures contracts.

22.     Defendant Citibank N.A. ("Citibank") is a wholly owned subsidiary of Citigroup, Inc., a corporation organized under the laws of Delaware, with its principal place of business in New York, New York. At all times relevant hereto, Citibank served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

23.     Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") was, during all or part of the Class Period, a subsidiary or affiliate of Citibank N.A. and/or Citigroup, Inc. and was engaged in clearing CME futures contracts.

24.     Defendant JP Morgan Chase & Co. ("JP Morgan") is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York. At all times relevant hereto, JP Morgan served on the Panel which reported interest rate information and did report such information, used by the BBA in deriving USD Libor.

25.     Defendant JP Morgan Clearing Corp. ("JP Morgan Clearing") was, during all or part of the Class Period, a subsidiary or affiliate of JP Morgan and was engaged in clearing CME futures contracts.

26.     Defendant JP Morgan Futures, Inc. ("JPMFI") was, during all or part of the Class Period, a subsidiary or affiliate of JP Morgan and was engaged in clearing CME futures contracts.

27.     Defendant UBS AG ("UBS") is a corporation organized under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. At all times relevant hereto, UBS served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

28.     Defendant UBS Securities LLC ("UBS Securities") was, during all or part of the Class Period, a subsidiary or affiliate of UBS and was engaged in clearing CME futures contracts.

29.     Defendant Credit Suisse Group AG ("Credit Suisse") is a corporation organized under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. At all times relevant hereto, Credit Suisse served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

30.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Credit Suisse and was engaged in clearing CME futures contracts.

31.     Defendant HSBC Holdings plc ("HSBC") is a corporation organized under the laws of England and Wales, with its principal place of business in London, England. At all times

relevant hereto, HSBC served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

32. Defendant HSBC Securities (USA) ("HSBC Securities") was, during all or part of the Class Period, a subsidiary or affiliate of HSBC and was engaged in clearing CME futures contracts.

33. Defendant Barclays Bank plc ("Barclays") is a corporation organized under the laws of England, with its principal place of business in London, England. At all times relevant hereto, Barclays served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

34. Defendant Barclays Capital Inc. ("Barclays Capital") was, during all or part of the Class Period, a subsidiary or affiliate of Barclays and was engaged in clearing CME futures contracts.

35. Defendant Lloyds Banking Group plc ("Lloyds") is a corporation organized under the laws of the United Kingdom, with its principal place of business in London, England. Lloyds was formed through the 2009 acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB"). At all times relevant hereto, Lloyds TSB and HBOS served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

36. Defendant West LB AG ("West LB") is a corporation organized under the laws of Germany, with its principal place of business in Dusseldorf, Germany. At all times relevant hereto, West LB served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

37.     Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a corporation organized under the laws of Scotland, with its principal place of business in Edinburgh, Scotland. At all times relevant hereto, Royal Bank of Scotland served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

38.     Defendant RBS Securities Inc. ("RBS Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Royal Bank of Scotland and was engaged in clearing CME futures contracts.

39.     Defendant Deutsche Bank AG ("Deutsche Bank") is a corporation organized under the laws of Germany, with its principal place of business in Frankfurt, Germany. At all times relevant hereto, Deutsche Bank served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

40.     Defendant Deutsche Bank Securities ("Deutsche Bank Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Deutsche Bank and was engaged in clearing CME futures contracts.

41.     Defendant the Norinchukin Bank ("Norinchukin") is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan. At all times relevant hereto, Norinchukin served on the Panel which reported interest rate information and did report such information used by the BBA in deriving USD Libor.

42.     CME's website states that on July 12, 2007, CBOT Holdings, Inc. merged with and into Chicago Mercantile Exchange Holdings Inc. to form CME Group Inc. "CME Clearing" is described therein as an operating division of CME Group, Inc., which clears trades made on

both the CME and CBOT, as well as on other exchanges and certain over-the-counter ("OTC") trades.

43.     As used herein, Defendants Bank of America, Barclays, Citibank, Credit Suisse, Deutsche Bank, Royal Bank of Scotland, HSBC, JP Morgan, Lloyds, Norinchukin, UBS, and West LB are referred to collectively as the "Panel Defendants."

44.     As used herein, Defendants Bank of America Securities, Barclays Capital, Citigroup Global Markets, Credit Suisse Securities, Deutsche Bank Securities, RBS Securities, HSBC Securities, JPM Clearing, JPMFI, and UBS Securities are referred to collectively as the "Clearing Defendants."

## FACTUAL ALLEGATIONS

### Libor Background

45.     Libor is a reference interest rate determined and published each business day by Thomson Reuters at the behest of the BBA. Thomson Reuters calculates Libor for a number of different currencies and for various maturities ranging from overnight to one year. The most important and most commonly used USD Libor rate is 3-month Libor.

46.     The BBA defines Libor as "[t]he rate at which an individual Contributor Panel Bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11:00 London time."    In other words, Libor rates are the average rates at which Contributor Panel Banks can obtain unsecured loans from other banks. Libor rates should be higher than the rates at which Contributor Panel Banks can obtain a secured loan because of the enhanced risk implicit in an unsecured loan.

47.     In order to calculate Libor, the BBA requests information from "Contributor Panel Banks." "Contributor Panel Banks" are banks selected by the BBA to self-report daily the

inter-bank borrowing rates used to calculate Libor. The Contibutor Panel Banks—typically large, institutional banks that regularly use the inter-bank borrowing market—are selected because they are assumed to be representative of other participants in the inter-bank loan market. In theory, polling these representative banks should result in a Libor rate that accurately reflects market conditions.

48. For USD Libor, the sixteen banks that compose the Contributor Panel self-report the interest rates, for varying maturities, at which they could borrow from other banks just prior to 11 am GMT that same day. Thomson Reuters calculates Libor for each maturity by discarding the four highest and four lowest reported rates and calculating the arithmetic mean of the eight remaining quotes. The BBA then publishes the rate (and the rate quotes submitted by Contributor Panel Banks) on its website.

49. Thus, published Libor rates are tied directly to the interest rate quotes self-reported to the BBA by the Contributor Panel Banks. Because Libor is calculated without reference to transactional data generated in an efficient marketplace, the accuracy and reliability of Libor is dependent on the willingness of the Panel Defendants and other Contributor Panel Banks to accurately report their borrowing costs to the BBA.

**Libor Directly Impacts Certain CME Exchange-Traded Futures and Options**

50. Libor is a primary benchmark rate for short-term interest rates, and many financial instruments are based on Libor. Indeed, the BBA states that

> [Libor] is the primary benchmark for short term interest rates globally. It is used as the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges and has recently been used as a barometer by the media to measure the health of financial monetary markets. [Libor] is used in many loan agreements throughout global markets including being used in mortgage agreements and loans.

Accordingly, a bank wishing to manipulate the value of short-term interest rates or financial instruments need only manipulate Libor.

51.     For example, Eurodollar contracts based on Libor, such as futures contracts based on Eurodollar deposits, are some of the world's most heavily traded products and are traded on exchanges like the CME.  CME Eurodollar futures contracts were subject to, and contractually required to be performed in accordance with, the CME rules, including CME Rule 432 prohibiting price manipulation.

52.     The final settlement price of a Eurodollar contract is 100 minus the Libor rate.  By way of example, if the Libor rate on the relevant date is 3.00%, the value of the Eurodollar contract is 97.  Suppression of Libor causes higher prices for Eurodollar contracts.  Thus, an investor taking a long position on a 3-month Eurodollar contract experiences a $25 increase in the value of his position for every 1 bps decrease in Libor, and a $25 decrease in his position for every 1 bps decrease in Libor.  This linear relationship shows the interconnectedness of Libor and the value of numerous Libor-based derivative instruments.

53.     In addition, investors taking a long position in Eurodollar contracts during the Class Period still suffered as a result of Defendants' deceptive practices, even if their Eurodollar portfolios experienced a net gain.  An investor entering a Eurodollar market in which rates are suppressed would pay a higher price when purchasing the contract than he would if rates were not suppressed.

54.     The CME and CBOT also list options on Libor-based derivatives, including the 3-Month CME Eurodollar futures contract and the 1-Month Eurodollar futures contract. The exchanges offer three different types of options: quarterly, serial and mid-curve.

55.     For instance, Eurodollar quarterly options are traded on Eurodollar futures expiring in March, June, September and December. The last day of trading of the quarterly options is 11:00 a.m. UK time on the second London bank business day preceding the third Wednesday of the contract month. Quarterly options are cash settled. Eurodollar serial options are traded on the next quarterly futures contract months expiring in January, February, April, May, July, August, October and November. The last day of trading in the serial options is 2:00 p.m. Chicago time on the Friday preceding the third Wednesday of the contract month. Serial options are settled by positions in front quarterly futures contracts. Eurodollar mid-curve options are short-dated American-style options on long-dated Eurodollar futures. These options, with a time to expiration of three months to one year, have as their underlying instrument Eurodollar futures one, two, or five years out on the yield curve. Mid-curve options provide a wide variety of hedging and trading opportunities on the mid-range of the yield curve – hence the name "midcurve" options.

56.     Interest rate swaps ("swaps") are another type of Libor-based financial instrument.  In a swap, one party pays a fixed rate on a notional amount of money, and the other party pays a floating rate, usually 3-month USD Libor, on that same notional amount.  Swaps allow entities to hedge their interest rate exposure to better match their asset-liability mix. Swaps, as well as futures and options contracts based on swaps, also allow entities to make speculative investments based on their view of future interest rates.  For instance, an entity that believes interest rates will rise may enter into a swap in which it receives floating interest payments and pays a fixed rate so that if rates rise, as expected by that entity, the floating rate payments received will increase while the fixed rate payments remain constant.

57.     Swap futures and options contracts tied directly to Libor also are traded on exchanges like the CME.  When Libor is manipulated downward, some swap holders suffer as cash flows from Libor-based variable interest rates decrease while fixed rate payments remain constant.  This in turn impacts the value of futures and options contracts based on those swaps.

### Market-Based Interest Rates Reveal Libor Manipulation

58.     The Panel Defendants' manipulation of Libor resulted in the breakdown of traditional relationships between Libor and market-based interest rates, rates derived from actual financial transactions and not self-reported figures.  The change in historical rates of correlation between Libor and these market-based rates demonstrate that the rates reported by the Panel Defendants to the BBA were significantly lower than the rates at which they were actually able to borrow money.

59.     The Eurodollar Bid Rate highlights the disconnect between the Panel Defendants' actual and reported borrowing rates.  Eurodollars are deposits of US dollars in foreign banks. Eurodollars are an important source of international finance as they are used to fund the vast majority of international loans.  The Eurodollar Bid Rate is the actual interest rate that banks, in competition with one another, offer to pay for Eurodollar deposits.  For two decades following Libor's inception in 1986, Libor had been approximately 6 to 12 basis points ("bps") above the market-based Eurodollar Bid Rate.  This gap is expected: there should be a bid-ask spread between what Banks are willing to pay to attract Eurodollar deposits (i.e. the Eurodollar Bid Rate) and the rate at which Banks are offered Dollar deposits by other banks (i.e. Libor).

60.     This historical trend crumbled in mid-2007 when the relationship between Libor and the Eurodollar Bid Rate inverted as Libor decreased to levels well below the Eurodollar Bid Rate.  This inversion makes little or no economic sense: the Eurodollar Bid Rate (the rate banks

pay to attract deposits) should not be higher than Libor (the rate at which banks are able to borrow money). If the relationship was actually inverted, one would expect the Eurodollar Bid Rate to fall and/or Libor to rise until there is a spread with the bid below the ask and an equilibrium is reached. This correction never occurred.

61.     The credit default swap ("CDS") market further demonstrates the Panel Defendants' downward manipulation of Libor. A CDS provides insurance for lenders in the event of a borrower default. A CDS purchaser pays a fee, or spread, to the CDS seller and the seller agrees to pay cash in the event of a default on the underlying loan. In the event that the borrower defaults, the CDS seller makes a payment to the CDS purchaser, effectively reducing the purchaser's financial exposure to the default.

62.     A CDS also may be used for speculative purposes. For example, an entity that purchases a CDS on a tranche of Citibank bonds would receive a payout in the event that Citibank defaults on its obligations. The selling entity's exposure to Citibank's credit risk is then the same as if the entity had purchased Citibank bonds or made a loan to Citibank.

63.     The spread (*i.e.*, the cost) on a CDS is dependent on the credit risk associated with the borrower in the loan underlying the CDS. As a borrower appears more likely to default on a loan, the spread for a CDS associated with that borrower should increase. Because there is an efficient market for trading CDSs, a company's CDS spread is a market-determined measure of that company's credit risk.

64.     Accordingly, a company's cost of borrowing should be the sum of its CDS spread (which accounts for credit risk) and the risk-free rate of return (traditionally, the yield on one-year Treasury bills).

65.     The Panel Defendants' CDS spreads should fluctuate in the same manner as the inter-bank rate quotes provided to the BBA.  In addition, the rate quotes provided to the BBA by the Panel Defendants should be higher than, though similar to, the Panel Defendants' borrowing costs as calculated by their CDS spread plus the risk-free rate.  Inter-bank loans are far less liquid than bank debt, such as corporate bonds, because there is no secondary market in which banks can securitize and sell tranches of inter-bank loans.  Moreover, holders of the types of bank debt commonly insured by CDSs should, in the event of a default, have a recovery rate that is at least as high as for inter-bank lenders.  Given the relationships between CDSs and inter-bank lending, the spread on CDSs for the Panel Defendants' bonds should provide a floor for Defendants' inter-bank borrowing costs.

66.     As a result of the financial crisis that began in 2007, the Panel Defendants, as well as other banks, were or were perceived to be in poor economic condition.  Accordingly, the Panel Defendants' CDS spreads increased significantly during the Class Period.

67.     Amazingly, the only market that failed to reflect the increased risk inherent in lending to the Panel Defendants was the inter-bank market.  An analysis in *The Wall Street Journal* found that the Panel Defendants' self-reported Libor rates did not correspond to their credit risk as measured in the CDS market.  That analysis also found that Panel Defendants with substantially different credit risks still reported identical Libor rates.  Defendant Citibank's self-reported rates averaged approximately 87 bps lower than the rate calculated using CDS pricing.  This trend holds for the other Panel Defendants as well.  These self-reported rates make no economic sense when compared to market rates derived from CDS pricing.  Indeed, *The Wall Street Journal* concluded that in the first four months of April, 2008, overall Libor submissions were underreported by about 0.25% in comparison to rates suggested by the CDS market.  In

mid-April, after the BBA announced its review of the Libor-fixing process, that difference shrank to an underreporting of about 0.15%.

68. The breakdown in the relationship between CDS spreads and self-reported Libor rates is further evidence of the Panel Defendants' downward manipulation of Libor. The rates reported during 2009 were so low that, for example, a trader who made a loan to Citibank at Citibank's quoted rate and then purchased CDS protection against Citibank's default would earn a negative rate of return. Such an outcome defies economic logic.

69. Trading in loans auctioned by the Federal Reserve—loans that, unlike inter-bank loans, require collateral—further demonstrates the Panel Defendants' manipulation of Libor. At certain points during the Class Period, interest rates on collateralized loans from the Federal Reserve to banks were *higher* than the comparable self-reported Libor rate, which represents *un*collateralized loans between banks. For example, in late 2008, the rate for the Federal Reserve's 28-day term auction facility (under which borrowings are secured) was 3.75% while the simultaneous rate of one-month Libor (under which borrowings are unsecured) was 3.19%. Uncollateralized loans are riskier, and therefore should have a higher rate, than collateralized loans, indicating that Libor was being manipulated downward.

70. Significantly, according to BBA data the difference between the three-month USD Libor and the U.S. Federal Reserve's target rate widened to a record 332 basis points on October 10, 2008. That spread had averaged about 22 basis points over the previous ten years.

71. Bids in the market for commercial paper also show the suppression of Libor. Commercial paper is an unsecured, short-term promissory note that banks and other companies issue to satisfy temporary liquidity needs. As another short-term, unsecured loan, rates for commercial paper should be comparable to inter-bank rates. But in April 2008, for example,

UBS was willing to pay 2.85% for money in the commercial paper market, while at the same time reporting to BBA that it could borrow money from other banks at 2.73%. If UBS could actually borrow in the inter-bank market at 2.73%, it would make no economic sense for it to borrow money in the commercial paper market at full 12 basis points higher. This indicates that UBS's inter-bank borrowing costs were in fact higher than the inaccurate 2.73% Libor quote it reported to BBA.

## Panel Defendant's Self-Reporting of Libor is Anomalous and Indicates Manipulation

72.     The Libor quotes reported by the Panel Defendants to the BBA further evince the Panel Defendants' downward manipulation of Libor during the Class Period.  As described in detail below, the Panel Defendants' self-reported Libor quotes (a) exhibited pronounced bunching near certain inflection points; and (b) lacked the differentiation among Defendants that would be expected given their differing credit risks.

73.     As explained above, Thomson Reuters discards the four highest and four lowest reported rates before calculating Libor.  Thus, a bank wishing to suppress Libor would need to report rate quotes just above the fourth lowest rate in order to avoid being discarded.  It is at this inflection point – just above the fourth lowest quote – that a quote would be most likely to succeed in suppressing Libor.

74.     The manner in which Libor is published makes it possible to effectively target the inflection point.  After Libor is calculated and published, the quotes provided by each of the Contributor Panel Banks are made public.  Thus, on every day during the Class Period on which the Panel Defendants self-reported rate quotes, the Panel Defendants also had access to the previous day's quotes.  This information gave the Defendants insight into what quotes would

have hit the inflection point on the previous day, thereby providing an estimate of where the inflection point would be on that day.

75.     The Panel Defendants' manipulation of Libor is evidenced by the bunching of their USD Libor quotes at the inflection point.  An academic study of Libor found "pronounced bunching" of self-reported rates during the first two quarters of 2009.  Absent manipulation, one would expect a distribution of Libor quotes that is not clustered around this lower bound.

76.     Suspicious upward movements in USD Libor further reveal the Panel Defendants' agreement to manipulate Libor.  On April 16, 2008 *The Wall Street Journal* reported that the Panel Defendants had previously been systematically understating to the BBA each Panel Defendant's costs of borrowing used to calculate and report USD Libor.

77.     During April 17-18, 2008, the days immediately following *The Wall Street Journal* report, USD Libor increased dramatically.  On April 16th the BBA reported USD Libor as 2.73375%.  By April 18th USD Libor rose to 2.90750%, a change 5.53 standard deviations greater than the average two-day fluctuation in USD Libor.

78.     This sudden change in Libor cannot be explained by an actual change in the Panel Defendants' borrowing costs.  Publicly available information does not reveal any changes in the Panel Defendant's operating costs, in interest rates other than USD Libor, in the demand for credit in U.S. dollars, or in any other factors pertinent to interest rates such that Libor's increase could be explained by anything other than an attempt by the Panel Defendants to conceal their agreement to suppress the value of USD Libor.

79.     Even a much smaller change than the five-plus standard deviation change in Libor on April 17-18 could not have occurred if only a few Panel Defendants greatly increased their reported borrowing rates to a level far above the rates reported by others.  As explained above,

the manner in which the BBA calculates Libor makes it impossible for one Panel Defendant to significantly impact Libor. Accordingly, the only explanation for the immense upward movement in USD Libor over April 17-18, 2008 is that the Panel Defendants simultaneously and significantly increased their reported borrowing rates in order to produce the dramatic increase in USD Libor and thereby conceal their fraudulent behavior..

80. The Panel Defendants' respective CDS spreads further demonstrate that their similar Libor quotes were most likely the product of a conspiratorial agreement. The traditional relationship between CDS spreads and Libor implies that the distribution of the Panel Defendants' Libor quotes should parallel the distribution of their CDS spreads. Before the Class Period, the Panel Defendants often submitted similar quotes, but their CDS spreads were also similar. Once the financial crisis dawned, however, the intra-day variation in the CDS spreads for the USD Libor Panel banks grew much larger than the variation in the banks' USD Libor quotes. For instance, West LB was seen by investors on March 10, 2008 as being nearly twice as likely as Credit Suisse to default on its obligations according to the companies' respective CDS spreads. Nevertheless, the next morning West LB quoted the same Libor rate as did Credit Suisse. In fact, West LB's rate submission was 0.7% lower than its default insurance rate would have indicated. A spokesman for West LB said that the bank provided accurate data.

81. These anomalous rate submissions prompted an extensive investigation by *The Wall Street Journal*, the results of which were published on May 29, 2008. The Journal's study— which was reviewed and found reliable by professors from Stanford University, Columbia University, and the London Business School—found that during the first four months of 2008, the 3-month USD Libor quotes self-reported by the USD Libor Contributor Panel banks, including the Panel Defendants, remained, on average, within a very tight range of 6 basis points.

This was the case despite the fact that different Panel Defendants were facing and were perceived to be facing different financial risks that rendered their perceived risks of default quite different.  Stanford finance professor Darrell Duffie stated that Defendants' self-reported rates "are far too similar to be believed," and David Juran, a statistics professor at Columbia, said that the Journal's analysis "very convincingly" shows that the Panel Defendants' self- reported rates are lower than what the market indicates they really are.

82.    In particular, *The Wall Street Journal's* analysis reflected that the widest gaps between the two measures involved the Libor rates reported by Citibank, West LB, HBOS plc (which was acquired by Defendant Lloyds in 2009), JP Morgan and UBS.  Citibank exhibited the largest discrepancy between the two measures.  As previously discussed, during 2008 Citibank submitted Libor quotes an average of 87 bps below its market-derived CDS spread.

83.    In addition, the rate quotes provided by Defendants for different currencies reveal manipulation of USD Libor.  Regardless of the currency, a bank's credit risk remains constant. Accordingly, a bank that reports a higher rate than a competitor bank for USD Libor should submit a higher rate for Yen Libor.

84.    Empirical evidence suggests that this was not the case during the Class Period. For instance Bank of America regularly quoted a lower USD Libor rate than Bank of Tokyo Mitsubishi while contemporaneously reporting a higher Yen Libor rate than Bank of Tokyo Mitsubishi.  Such an occurrence is possible only in a market rife with manipulation.

**Investigations into Libor Rate Setting**

85.    Numerous regulators, professional organizations, analysts, and news agencies have or are investigating Defendants' self-reported Libor rates.

86.     On April 3, 2008, the Bank of England money-market committee held a meeting of United Kingdom banks. The minutes of that meeting state that: "U.S. Dollar Libor rates had at times appeared lower than actual traded interbank rate."

87.     According to *The Wall Street Journal*, in early 2008, two economists from the Bank on International Settlements "expressed concerns that banks might report inaccurate rate quotes" to the BBA for Libor setting purposes.

88.     On April 16, 2008, under the headline "Finance markets on edge as trust in Libor wanes," *The Wall Street Journal* reported a claim by Scott Peng, an analyst at Citigroup, that although, because of the credit crunch, Libor was already high relative to the rates set by central banks, it should be even higher. Three-month USD Libor, Peng suggested, should actually be 30 basis points higher than it was – a difference that represents huge amounts of money, given the trillions of dollars indexed to it. The BBA responded by telling *The Wall Street Journal* that it was monitoring inputs closely and that if it was "deemed necessary", it would "take action to preserve the reputation and standing in the market of our rates" – a warning that *The Wall Street Journal* read as a threat to remove any bank making dubious inputs. Over the next two days, three-month dollar Libor rose by 16 basis points. Suspiciously, other lending rates for other currencies fell or remained relatively flat at the time Libor surged, a sign that the USD Libor rate was susceptible to manipulation.

89.     On April 16, 2008, the BBA announced that it would review the integrity of Libor. In December 2008, Libor released a report entitled "Libor Governance and Scrutiny" which did add more banks to the Libor reporting group but did not address whether false rates had been submitted.

90.     In a note to clients following the surge in Libor rates in mid-April 2008, UBS strategist William O'Donnell suggested that banks were responding to the heightened scrutiny, saying that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market." Also, William Porter, credit strategist at Credit Suisse, said he believed the three-month dollar rate was 0.4 percentage points below where it should have been. That echoed the view of Mr. Peng who believed that said that Libor understated banks' true borrowing costs by as much as 30 basis points.

91.     According to a May 29, 2008 Bloomberg News article, Tim Bond, a strategist at Barclays Capital, a Defendant herein, represented that banks routinely misstated borrowing costs to the BBA to avoid the perception they faced difficulty raising funds as credit markets seized up:

> "The rates the banks were posting to the BBA became a little bit divorced from reality," Bond, head of asset-allocation research in London, said in a Bloomberg Television interview. "We had one week in September where our treasurer, who takes his responsibilities pretty seriously, said: 'right, I've had enough of this, I'm going to quote the right rates.' All we got for our pains was a series of media articles saying that we were having difficulty financing.'" Also according to the news article, Barclays plc, the U.K.'s third-biggest bank and parent of Barclays Capital, quoted three-month dollar rates to the BBA that averaged 7 basis points more than those of their peers in the first week of September. Barclays dropped 9.1 percent on the London Stock Exchange that week, compared with the 5.5 percent decline in the 59-member Bloomberg Europe Banks and Financial Services Index. "Above the Parapet …Other banks tried to push their head above the parapet on occasions as well, but with every attempt you were met with a lot of rumor and innuendo," Bond said in the interview. "It wasn't a very easy environment."

92.     On June 2, 2008, *The Financial Times* reported that "... the rate of borrowing in Libor has lagged behind other market-based measures of unsecured funding used by the vast majority of financial institutions. This has aroused suspicions that the small group of banks

which supply the BBA with Libor quotes have understated true borrowing rates so as not to fan fears (that) they have funding problems."

93.    On March 15, 2011, UBS disclosed that it had received subpoenas from the United States Securities and Exchange Commission, the Commodity Futures Trading Commission and the Department of Justice, seeking information concerning "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." UBS reported that the Japanese Financial Supervisory Agency also requested information relating to UBS's Libor self-reporting.

94.    The March 15, 2011 *Financial Times* also reported that Bank of America, Citibank and Barclays had received subpoenas and that "[a]ll the panel members are believed to have received at least an informal request for information[.]"

95.    On May 23, 2011, *The London Daily Telegraph* reported that the FBI joined regulators in their investigation, suggesting that the U.S. Government may seek to charge the Defendants with criminal conduct.

### Defendants Were Financially Motivated to Suppress Libor

96.    The Panel Defendants are major participants in the swap market. Interest rate swaps are often tied directly to Libor, most commonly to 3-month and 6-month Libor. During 2009, Defendants JP Morgan and Bank of America *each* had nearly $50 *trillion* notional value of interest rate swaps on their books—more than three times the notional value of interest rate swaps that Citibank had—making the potential impact of Libor rates even greater for those Defendants.

97.    Panel Defendants' reported revenues from their derivative portfolios are similarly revealing. Although the Panel Defendants may wish to claim that the aggregate notional value of

swaps presented above is misleading because of the extent to which swaps are used to hedge interest rate risk, there is no denying that Defendants depended on their interest rate derivative portfolios for substantial income. From 2007 through the third quarter of 2009, Citibank reported an average of $12.9 billion in interest revenue[1] per fiscal quarter. During the same period, Bank of America and JP Morgan reported interest revenues averaging $10.5 and $9.7 billion, respectively, per fiscal quarter.

98.     Moreover, during the Class Period, the Panel Defendants were biased towards lower interest rates—*i.e.,* they stood to profit more (or lose less) if interest rates, including Libor, were lower. For example, Citibank acknowledged in early 2009 that its net interest revenue would increase by nearly $1 billion if interest rates fell by 1% over the course of one year—and by nearly $2 billion if interest rates immediately fell by 1% and remained that way for one year. As explained above, during this period Citibank reported Libor rates near the bottom of the effective range, helping pushing the Libor rate lower than it otherwise would have been.

99.     However, the Panel Defendants' manipulation was motivated by more than just financial gain. The Panel Defendants' control over Libor provided them with an opportunity to protect their reputations. Historically, Libor has been a key indicator of the financial health of banks. When banks have access to funds, their borrowing rates are low. Conversely, when banks' access to funds is more limited, their borrowing rates increase.

100.    Beginning in 2007, increasing numbers of banks began to detect potential difficulties with subprime and other loans. Widespread problems involving subprime mortgages tightened the availability of credit to banks and increased the interest rates paid by banks on their own borrowings.

---

[1] "Interest Revenue," as used above, refers to the aggregate of net interest revenue and trading revenue on interest rate options, futures and derivatives.

101.    But the banks did not want knowledge of their increasing borrowing costs to enter the public realm. As illustrated by the subsequent collapse of Bear Stearns, even the perception of financial difficulty can have negative repercussions with investors and clients. The Panel Defendants did not want the market to realize just how difficult their economic environment had become.

102.    The Panel Defendants also shared an incentive to agree to underreport Libor in order to minimize the public's perception of one another's financial health. Higher-reporting banks would have brought unwanted attention to their own financial stress as a threat not only to their own stability, but to that of the other banks in their roles as creditors and counterparties.

103.    Meanwhile, the Panel Defendants' manipulative acts had a negligible impact on loan revenues.  The Panel Defendants did make loans tied to Libor during the Class Period, but they protected themselves from the artificially low Libor rates that they created by instituting "floors" on their loans such that even if Libor rates were severely depressed, the interest that Panel Defendants actually charged clients would remain higher than Libor.

104.    Though Libor floors were not common prior to the beginning of the Class Period, as one commentator notes: "Libor floors have been commonly used in the low Libor environment which started in early 2008." According to one money manager, in 2008 Libor floors were rare but by 2010 every new high yield loan was written to include a fixed floor.

105.    Libor floors allowed the Panel Defendants to suppress Libor and earn huge profits on their swap and other derivative positions while not sacrificing much yield from their loan portfolios.

## **FRAUDULENT CONCEALMENT**

106.     Throughout the relevant time period, Defendants and their co-conspirators have affirmatively and wrongfully concealed their unlawful conduct from Plaintiff and the Class.

107.     By its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended upon its self-concealing nature.

108.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

109.     To avoid detection, the Panel Defendants were in regular and virtually continuous contact with one another, including by having regular and extremely frequent communications with respect to their interest rates paid for short-term borrowings.

110.     During the relevant time period, Defendants and co-conspirators repeatedly claimed that Libor was not being manipulated and that the process for determining Libor was sound. These statements were a pretext to conceal Defendants' conspiracy to suppress Libor.

111.     Plaintiff and members of the Class reasonably relied on the materially false or misleading explanations by Defendants, which lulled Plaintiff and members of the Class into believing that Libor had not been manipulated and was not artificially suppressed.

112.     Defendants' public statements about Libor rates were designed to, and did, cause Plaintiff and members of the Class to accept those rates without undertaking further inquiry. Even if such an inquiry had been undertaken, it would have proven futile because Plaintiff and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications were valid.

113. At the time, Plaintiff and members of the Class considered Defendants' articulated reasons for the Libor reporting to be both normal and legitimate, and, accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Libor reporting.

114. Plaintiff and members of the Class could not have discovered the alleged conspiracy at a date earlier than March 15, 2011, by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and wrongfully conceal, their conspiracy.

115. It was not until March 15, 2011, the date on which it was publicly disclosed that the United States was investigating UBS's Libor rate setting, that Plaintiff and members of the Class became aware, or could have become aware with the exercise of reasonable diligence, of Defendants' unlawful conduct regarding Libor rate reporting.

116. The conspiracy that is the subject of this action was fraudulently and wrongfully concealed by Defendants by various means and methods, including, but not limited to: (a) secret meetings; (b) misrepresentations to their customers and the public concerning the Libor rate; and (c) surreptitious communications among Defendants by the use of the telephone or in-person meetings and through private e-mail accounts in order to limit the existence of written records, minimize access to any written records, and conceal from non-conspirators the existence and nature of their discussions regarding their scheme to suppress Libor.

117. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until March 15, 2011, Plaintiff and members of the Class had knowledge of neither the conspiracy that is the subject of this action nor of any

facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

118.     None of the facts or information available to Plaintiff and members of the Class prior to March 15, 2011, if investigated with reasonable diligence, could or would have led, nor did lead, to the discovery of the conspiracy that is the subject of this action.

119.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been equitably tolled as to any claims of Plaintiff or members of the Class arising from Defendants' unlawful conduct that is the subject of this Complaint.

## CLASS ACTION ALLEGATIONS

120.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23, on its own behalf and as representatives of the following class of persons and entities (the "Class"):

> All persons, corporations and other legal entities (other than Defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators) that, during the period January 1, 2006 through December 31, 2009 (the "Class Period") purchased or sold CME Eurodollar futures or options contracts, including 3-month and 1-month contracts, or other CME or CBOT futures or options contracts whose value is derived in whole or in part from Libor.

121.     The Class is so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, based on the nature of the financial instruments involved, Plaintiff reasonably believes that there are at least thousands of members in the Class. Class members are geographically dispersed throughout the United States.

122.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

a. Whether Defendants' conduct constituted an unlawful act;

b. Whether Defendants manipulated Libor-based futures, options or derivatives;

c. Whether Defendants conspired to manipulate Libor-based futures, options or derivatives;

d. Whether Defendants agreed or conspired to suppress, fix, or maintain Libor-based futures, options or derivatives in violation of the antitrust laws;

e. The geographic scope and duration of Defendants' manipulation of Libor-based futures, options or derivatives;

f. Whether Defendants' unlawful conduct caused injury to the business or property of the Plaintiff and the Class;

g. The fact and amount of impact on Libor-based futures, options or derivatives prices caused by Defendants' conduct; and

h. The appropriate measure of damages.

123. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class have all sustained damage in that during the Class Period they transacted financial instruments tied to Libor, which was suppressed by Defendants. Defendants' conduct, the effects of such conduct, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

124. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members.

125.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.

## COUNT I

### VIOLATION OF THE COMMODITY EXCHANGE ACT
#### (Against The Panel Defendants)

(7 U.S.C. § 1, *et seq*.)

126.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

127.    The CME has been designated by the Commodity Futures Trading Commission ("CFTC") as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in various Libor-based futures, options, swaps and other derivative products. CME is an organized, centralized market that provides a forum for trading Libor-based futures, options, swaps and other derivative products.

128.    As to the CME Libor-based future, options and derivatives, by their intentional misconduct, the Panel Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and manipulated prices of Libor-based futures and options contracts during the Class Period.

129.     Panel Defendants' extensive manipulative conduct deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

130.     Plaintiff and others who transacted in CME Libor-based futures, options and derivative contracts during the Class Period transacted at artificial and unlawful prices resulting from Panel Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*., and as a direct result thereof were injured and suffered damages.

131.     Plaintiff and the Class are each entitled to actual and punitive damages for the violations of the CEA alleged herein.

132.     As a further direct and proximate result of the acts of Defendants, Plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

## COUNT II

### AIDING AND ABETTING VIOLATIONS OF SECTION 22 OF THE COMMODITY EXCHANGE ACT
### (Against All Defendants)

133.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

134.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of other Defendants' manipulations of Eurodollar futures contracts prices, including by false reporting of interest rate information, and willfully intended to assist these manipulations to cause the price of CME Eurodollar futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

135.    Plaintiff and the Class are each entitled to actual and punitive damages for the violations of the CEA alleged herein.

136.    As a further direct and proximate result of the acts of Defendants, Plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

## COUNT III

### <u>VICARIOUS LIABILITY UNDER THE COMMODITY EXCHANGE ACT</u>
**(Against The Panel Defendants)**

137.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

138.    Each Panel Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## COUNT IV

### <u>VIOLATION OF SHERMAN ACT SECTION 1</u>
**(Against The Panel Defendants)**

(15 U.S.C. § 1)

139.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

140.    The Panel Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Action and Section 4 of the Clayton Act.

141.    During the Class Period, the Panel Defendants controlled what Libor rate would be reported and therefore controlled prices in the market for Libor-based derivative contracts.

142.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among the Panel Defendants and their co-conspirators in furtherance of which the Panel Defendants fixed, maintained, and/or made artificial prices for Libor-based derivative contracts. The Panel Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

143.     The Panel Defendants' conspiracy, and resulting impact on the market for Libor-based derivative contracts, occurred in and affected interstate and international commerce.

144.     As a proximate result of the Panel Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

145.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

**COUNT V**

**BREACH OF CONTRACT**
**(Against The Clearing Defendants)**

146.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

147.     The CME Rules, including without limitation Rule 432, to which every contract traded on the CME is subject and which provide standards of performance of such contracts, prohibit price manipulation.

148.     One of the terms of all CME Eurodollar futures and options contracts provides that such contracts financially settle to Libor.

149.     By intentionally misstating their Libor rates, the Panel Defendants caused the prices of such Eurodollar futures and options contracts to be manipulated and not to be the product of legitimate market forces of supply and demand.

150.    The conspiracy and other unlawful conduct of the Panel Defendants caused the Clearing Defendants, which were each subsidiaries or affiliates of the Panel Defendants, to breach the CME Eurodollar futures contracts by imposing manipulated prices as settlement prices of those contracts in violation of CME rules, including without limitation CME Rulebook Chapter 452, and the Clearing Defendants' duties to Plaintiff and members of the Class, including duties of good faith and fair dealing.

151.    Such multiple breaches of the CME Eurodollar futures and options contracts by causing artificial settlement prices further manipulated the benchmark prices for such contracts to which the market trades.

152.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Clearing Defendants actual and punitive damages, costs and attorneys' fees.

**COUNT VI**

**<u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS</u>**
**(Against The Panel Defendants)**

153.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

154.    By intentionally misstating their Libor rates and by causing the prices of CME Eurodollar futures and options contracts to be manipulated and not the product of legitimate market forces of supply and demand, the Panel Defendants induced the breach of such contracts by preventing Plaintiff and members of the Class from obtaining performance at non-manipulated prices.

155.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from Panel Defendants actual and punitive damages, costs and attorneys' fees.

## COUNT VII

## TORTIOUS INTERFERENCE WITH BUSINESS OR ECONOMIC ADVANTAGE
### (Against The Panel Defendants)

156.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

157.    Plaintiffs and members of the Class had a reasonable expectation that the financial instruments they entered into whose prices were based upon Libor were priced upon free and open competition, and therefore that in entering into these transactions they were entering into valid business relationships.

158.    The Panel Defendants, who took pains to conceal their conduct in underreporting Libor, knew of the foregoing expectation of Plaintiff and members of the Class.

159.    The Panel Defendants' purposeful interference prevented the legitimate expectancy of Plaintiff and members of the Class from ripening into a valid business relationship at prices which were free of manipulation.

160.    As a direct result of the Panel Defendants' interference, Plaintiff and members of the Class have been damaged.

161.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Panel Defendants actual and punitive damages, costs and attorneys' fees.

## COUNT VIII

## RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT
**(Against All Defendants)**

162.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

163.    It would be inequitable for the Defendants to be allowed to retain the benefits which the Defendants obtained from their illegal agreement and manipulative acts and other unlawful conduct described herein, at the expense of Plaintiff and members of the Class.

164.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed upon the benefits to the Defendants from their unjust enrichment and inequitable conduct.

165.    Alternatively or additionally, each Defendant should pay restitution of its own unjust enrichment to Plaintiff and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative, and designating Plaintiff's counsel as Class Counsel.

(B)    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(C)    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, and all punitive and exemplary damages allowed under the CEA;

(D)     For a judgment awarding Plaintiff and the Class damages from the Panel Defendants for their violations of the common law;

(E)     For a judgment awarding Plaintiff and the Class damages from the Clearing Defendants for their violations of the common law;

(F)     For an award of prejudgment interest in an amount to be determined in accordance with federal law;

(G)     For an award to Plaintiff and the Class of their costs of suit;

(H)     For an award to Plaintiff and the Class of attorneys' fees; and

(I)     For such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: June 28, 2011                    By:     *s/       Anthony F. Fata*
                                                Patrick E. Cafferty
                                                Anthony F. Fata
                                                Daniel O. Herrera
                                                Cafferty Faucher LLP
                                                30 N. LaSalle, Suite 3200
                                                Chicago, Illinois 60602
                                                Phone: 312/782-4880
                                                Facsimile: 312/782-4485
                                                pcafferty@caffertyfaucher.com
                                                afata@caffertyfaucher.com
                                                dherrera@caffertyfaucher.com

                                                ***Counsel for Plaintiff
                                                and Proposed Class Counsel***